# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

**Maria Teresa's Babies, Inc. d/b/a
Maria Teresa's Babies Early
Enrichment Center
825 23rd Street S
Arlington, VA 22202**

    **and**

**Maria Teresa DeSaba
825 23rd Street S
Arlington, VA 22202**

        **Plaintiffs,**

   **v.**

**Arlington County
SERVE:
Office of the County Attorney
2100 Clarendon Blvd., Suite 403
Arlington, VA 22201**

    **and**

**Arlington County Board of Directors
SERVE:
Office of the County Attorney
2100 Clarendon Blvd., Suite 403
Arlington, VA 22201**

    **and**

**Anita Friedman, individually and in
her capacity as Director of Human Services
SERVE:
Office of the County Attorney
2100 Clarendon Blvd., Suite 403
Arlington, VA 22201**

    **and**

**Tabitha Kelly, individually and in her
capacity as Division Chief,
Department of Human Services
SERVE:
Office of the County Attorney
2100 Clarendon Blvd., Suite 403
Arlington, VA 22201**

**Civil Action No.**

1

**and**

**Erika Gibson, individually and in her
capacity as Child Care Supervisor,
Department of Human Services,
Child & Family Services Division
SERVE:
Office of the County Attorney
2100 Clarendon Blvd., Suite 403
Arlington, VA 22201**

  **and**

**Anailim Dally, individually and in her
capacity as Child Care Specialist,
Department of Human Services,
Child & Family Services Division
SERVE:
Office of the County Attorney
2100 Clarendon Blvd., Suite 403
Arlington, VA 22201**

  **and**

**Christina Williams, individually and in her
capacity as Child Care Licensing Specialist,
Department of Human Services,
Child & Family Services Division
SERVE:
Office of the County Attorney
2100 Clarendon Blvd., Suite 403
Arlington, VA 22201**

  **Defendants.**

## COMPLAINT

Plaintiffs Maria Teresa's Babies, Inc. d/b/a Maria Teresa's Early Enrichment Center and

Maria Teresa DeSaba, by counsel, submit the following complaint against Defendants Arlington

County, Arlington County Board of Directors, Anita Friedman, Tabitha Kelly, Christina Williams,

Anailim Dally and Erika Gibson and state the following in support of the same:

2

## PARTIES

1.      Plaintiff Maria Teresa's Babies, Inc. d/b/a Maria Teresa's Early Enrichment Center ("MTB" or the "Center") is a Virginia corporation with its principal place of business in Arlington County, Virginia.

2.      Plaintiff Maria Teresa DeSaba is a resident of Arlington County, Virginia and the owner and founder of MTB.

3.      Defendant Arlington County (the "County") is a County organized and existing under the laws of the Commonwealth of Virginia.

4.      Defendant, the Arlington County Board (the "Board") is the governing body of the Arlington County.

5.      Defendant Anita Friedman ("Friedman") is employed by the County as the Director of Human Services for Arlington County and, upon information and belief, is a resident of Arlington County.

6.      Defendant Tabitha Kelly ("Kelly") is employed by the County as the Division Chief for Arlington County's Department of Human Services ("DHS") and, upon information and belief, is a resident of Arlington County, Virginia.

7.      Defendant Erika Gibson ("Gibson") is employed by the County as a Child Care Supervisor with Arlington County's Child & Family Services Division ("CFSD") and, upon information and belief, is a resident of Arlington County.

8.      Defendant Anailim Dally ("Dally") is employed by the County as a Child Care Specialist with CFSD and, upon information and belief, is a resident of Arlington County.

9.      Defendant Christina Williams ("Williams") is employed by the County as a Child Care Licensing Specialist with Arlington County's CFSD and, upon information and belief, is a resident of Arlington County.

## JURISDICTION

10.     This action is authorized and instituted pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1983 and the laws of the Commonwealth of Virginia.

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1343 to redress the unlawful deprivation of Plaintiffs' rights secured by the United States Constitution and federal law. This court can also exercise pendant or supplemental jurisdiction over Plaintiffs' claims arising under the common law and statutes of the Commonwealth of Virginia and which share a common nucleus of operative fact with federal claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all of the wrongful conduct occurred in the Commonwealth of Virginia.

13.     Venue is proper in this Court pursuant to §8.01-261(2) because the events giving rise to the allegations in this Complaint took place in Arlington County.

## ADMINISTRATIVE AND STATUTORY PREREQUISITES TO SUIT

14.     Pursuant to Va. Code § 15.2-209, Plaintiffs served the County notice of their claims on April 1, 2020.

15.     The County Attorney acknowledged receipt on April 14, 2020.

16.     There are no statutory prerequisites required before filing under 42 U.S.C. § 1981 or 42 U.S.C. § 1983.

**FACTS**

17.     MTB is a Spanish immersion childcare preschool in Arlington County, Virginia that has been in operation for over 10 years.

18.     MTB was founded by Maria Teresa Desaba.

19.     Tony Saba is Ms. Desaba's son and is an administrator with MTB.

20.     Ms. Desaba has been an Arlington resident since 1990 and has worked with children for over 30 years.

21.     Ms. Desaba has an excellent reputation within the community surrounding MTB and is known for her passion for working with children and ensuring that they have a home away from home to feel safe.

22.     This was the driving force for selecting a residential neighborhood for the Center's location as opposed to a commercial setting.

23.     The majority of MTB's staff are native Spanish speakers, as the Center is a Spanish Immersion childcare center.

24.     MTB has a childcare license through Arlington County.

25.     The County Board adopted Chapter 52 of the Arlington County Code (the "Code") pursuant to the authority granted in Va. Code § 15.2-741 to safeguard the children and families in the County.

26.     The County's Child & Family Services Division is a Division of the Department of Human Services.

27.     Chapter 52 regulates childcare licenses in the County. A childcare license may only be suspended when there is a violation of Chapter 52 or the Code generally, the Virginia Code, or when the "life, health, safety, or welfare of children is in imminent danger."

28.     When DHS suspends a license, Chapter 52 requires DHS to provide notice in writing stating the "1. The effective date and period of the suspension; 2. Reason(s) for the suspension; 3. The regulatory violation(s) which is the basis for the suspension; 4. That the licensee must stop providing care of the effective date of the suspension; and 5. The applicant's right to appeal the suspension in accordance with the appeals process established in § 52-17." Code § 52-13(B).

29.     Section 52-15 of the Code authorizes inspections for various purposes including licensing, routine monitoring, and responding to complaints made against the facility.

30.     Section 52-15(D) provides that a "report of inspection findings will be provided to the center following the completion of any inspection."

31.     Section 52-16 outlines the Department's enforcement authority with respect to Chapter 52. DHS is limited to the following enforcement actions in response to any violations of Chapter 52:

1. Issuance of written inspection reports, including correct action plans, requests to submit a corrective action plan to the Department, and notices of intention to initiate enforcement through denial, suspension, or revocation of a license;
2. Meetings or telephone conferences between the Department and the licensee to discuss corrective action plans;
3. Intermediate sanctions such as:
   a. Reduction of capacity;
   b. Prohibition on new admissions;
   c. Mandated training;
   d. Requiring the licensee to contact parents/guardians about health and safety violations;
4. Denial of application for a new or renewed license;
5. Suspension of a license
   a. A license may be temporarily suspended without a hearing upon written notification to the licensee by the Department **upon finding that the public life, health, safety or welfare of a child is in imminent danger**; or
6. Revocation of a license.

6

Arlington County Code § 52-16(B) (emphasis added).

32.     Section 52-17 provides for an appeal any time there is a denial of an application for a new or renewed license, a suspension or revocation of a license, or "**any other action that adversely impacts the licensee**."

33.     Sections 52-23 and 24 outline the requirements for staff. There is no mention of translated diplomas, I-9s or other related documentation. While the Code requires that staff who work with children be able to communicate with emergency services, there is no requirement that childcare staff have full English mastery.

34.     At all relevant times, MTB complied with all state and local laws. Prior to July 25, 2019, the Center had never been cited for more than a minor violation and was never shut down

**July 25th Inspection and Closure**

35.     On July 25, 2019, the County's Child Care Services Office ("CCS") initiated an investigation into the Center in response to an anonymous complaint. The investigation was led by Gibson, who was accompanied by Williams and Dally (collectively, the "Investigators").

36.     The anonymous complaint alleged "improper staff, documentation, improper food services of re-warming old food, the presence of rodents and rodent traps, staff supervising more children than allowed by ratio requirements and qualifications of staff."

37.     During the investigation, CCS investigators aggressively interrogated and intimidated MTB's staff on their names and dates of birth, causing staff members to become nervous and respond incorrectly to the questioning.

38.     Dally took each staff member into the hallway and performed a verbal "language test." This "test" was performed outside the presence of Ms. Desaba or Mr. Saba.

39.     No information was given to MTB at any time regarding what this "test" entailed or how the staff members' English competency was evaluated.

40.     Additionally, CCS investigators also alluded to the fact that MTB's staff was missing documentation. However, the investigators did not review all of MTB's files during their investigation. If they had, the investigators would have seen that much of the "missing" documentation was actually contained in MTB's files.

41.     The investigators also claimed that I-9 forms for staff were "missing" from staff files, but § 52-24(A)(1) of the Arlington Code does not require I-9 forms from staff.

42.     Friedman subsequently admitted that the investigators had no authority to enforce immigration laws and should not have asked about I-9 documentation.

43.     In August 2019, the County revealed that as of the July 25, 2019 investigation, only one staff member had a sworn statement that had expired, and four (4) staff members were missing information in their files regarding out-of-state Central Registry checks.

44.     These missing documents did not endanger MTB's students and could have been rectified immediately if the County had told MTB which employees needed current documentation.

45.     CCS investigators also claimed that there was insufficient staff supervising children on the day of the visit. However, during the July 25th investigation, there were 12 qualified staff and 62 children present, which satisfied the requirement.

46.     At all relevant times, the Center received regular monthly extermination to prevent rodents and pests.

47.     At all relevant times, the Center passed all inspections with the County's Public Health Division and has never been cited for rodents and/or pests.

48.     Subsequent to the investigation, Gibson informed Ms. Desaba, and Mr. Saba, that the Center's license was suspended that day, but did not provide a reason.

49.     MTB received a Verification of Site Visit which did not state any violations, but rather under Preliminary Inspection Findings listed "complaint investigation is ongoing at this time."

50.     On July 25, 2019, Defendants had not made a finding that the public life, health, safety or welfare of any student and the Center was in imminent danger.

51.     On July 25, 2019, Ms. Desaba and Mr. Saba had no information on the alleged violations against MTB or why the Center was shut down.

**Suspension Letter**

52.     Following the July 25th inspection, MTB received a letter stating that the Center's childcare license with the County would be suspended effective Thursday, July 25, 2019, pending an investigation.

53.     The letter stated that MTB was not in compliance with Arlington County Code Sections 52.24.A.1.a, b, c regarding the requirement that all staff have "satisfactory national criminal background checks prior to employment, a sworn statement or affirmation prior to the first day of employment, and a completed central registry search within 30 days of employment." The letter also cited Section 52-24.A.3.a, the requirement that "staff shall be of good character and reputation."

54.     However, in the letter, CCS did not identify any specific MTB staff or files as noncompliant or provide any additional information to inform MTB of the basis for the Center's closure.

9

55.     None of the alleged violations, even if proven true, put the children enrolled at the Center in imminent danger and could have been rectified immediately if MTB had full information from the County.

56.     The letter did not state that the County had made a finding that the public life, health, safety or welfare of any student and the Center was in imminent danger.

57.     The letter also stated that pursuant to County Code § 52-17, MTB had the right to appeal the decision by requesting a hearing to contest the suspension.

58.     MTB did so promptly in writing on July 26, 2019.

59.     On Friday, July 26, following the investigation and mandated closure of the Center, CCS returned to MTB to continue their investigation, presumably to identify supporting information for their suspension decision.

60.     At the July 26th inspection, for the first time, Gibson communicated that any staff member whose file was subject to review by the County would have to be present in order for the County to review the staff member's file.

61.     Ms. Desaba and Mr. Saba immediately began calling staff and asking them to come in, however, many were not able to come in time for the inspection and Gibson refused to review their files.

62.     CCS did not gather any additional information during the July 26th inspection.

63.     At the conclusion of the July 26th inspection, MTB had no further information regarding the specific allegations against the Center.

64.     The Virginia Department of Social Services ("VDSS") sent investigators to the Center on July 26, 2020 and conducted an investigation, including an inspection of the same files the County reviewed.

65.     VDSS found that only one staff member had an expired statement.

66.     VDSS also found additional minor violations, including missing out-of-state Central Registry checks for the four (4) staff members identified by the County during the July 25th investigation.

67.     VDSS did not suspend or restrict the Center's license in any way as a result of the investigation and permitted the Center to correct the minor violations.

68.     VDSS did not find that the public life, health, safety or welfare of any student and the Center was in imminent danger.

**July 30th Hearing**

69.     It was not until 2:01 p.m., on July 29, 2019, that MTB was informed that the appeal hearing for the suspension was scheduled for the next day at 11:00 a.m.

70.     MTB did not receive any communication about their ability to be represented by counsel.

71.     When MTB inquired about whether they needed to have an attorney present for the hearing, Gibson dissuaded MTB from seeking the assistance of counsel, stating that if MTB wanted to be represented by counsel, the process would take longer and the Center would remain closed.

72.     As a result, on July 30th, MTB attended the hearing unrepresented, with no specific information on the allegations against them.

73.     MTB was not given the opportunity to question the County witnesses regarding the allegations against the Center or to present evidence or provide witnesses to contest the closure of the Center.

74.     The hearing was not recorded and no transcript of the hearing is available.[1]

75.     On August 6, 2019, 11 days after the Center was shut down and 6 days after the July 30th hearing, Friedman sent a letter to MTB stating that "after careful review of the record in [the] case and of the evidence presented at the hearing held on Tuesday, July 30, 2019 at 11:00am, I have decided to uphold the suspension of [the Center's] childcare license."[2]

76.     The suspension was to last the pendency of the County's investigation, which was ongoing with no end date.

77.     As a result, following the July 30th appeal hearing, the County mandated that MTB communicate to parents that they were required to close and that its childcare license was temporarily suspended as a result of "inconsistent information on critical documents that verify staff safety and their eligibility to care for children."

78.     In the letter, MTB also included that the decision was appealed, and that there was an ongoing investigation that would "conclude upon a full review of documentation and review of staff qualifications."

79.     The County also included a list of alternative childcare options for parents, causing parents to pull their children out of MTB permanently and enroll in childcare elsewhere.

80.     This correspondence was signed by Gibson.

---

[1] Mr. Saba request a copy of any audio or other recording of the July 30, 2019 hearing and/or any transcript of the hearing via a November 15, 2019 FOIA request. No transcripts or records were provided. The County represented to Mr. Saba on multiple occasions that the hearings are not recorded.

[2] Mr. Saba requested a copy of all evidence presented at the July 30th hearing on September 3, 2020. The County responded on September 23, 2020. The response was largely duplicative of the response to Mr. Saba's November 15, 2019 FOIA request and none of the documents provided were marked as evidence or otherwise indicated to be part of the administrative record for the July 30th hearing. In fact, almost all of the documents were dated after July 30, 2019.

**Reopening**

81.     MTB was shut down from July 25 through August 12, 2019—twelve of those days were days that it should have been open for its students.

82.     During this period, after the July 25th investigation, CCS conducted three follow-up investigations, held on—July 26th, August 5th, and August 9th.

83.     On Friday, August 9, 2019, Gibson sent an email to MTB stating that the Center would be permitted to reopen, however, that only 12 specified "qualified" staff would be permitted to work at the Center.

84.     These were the same staff that were deemed "not qualified" during the July 25th inspection.

85.     The August 9th communication from Gibson was the first time MTB learned about the specific documents the County claimed were missing from MTB staff files on July 25th, leading to the shutdown.

86.     The documents listed as missing included updated sworn statements, medical certifications, and translations of diplomas.

87.     Translations of diplomas were not required for staff files and a diploma was also not required for staff to care for the children.

88.     Lack of translated diplomas in the staff files did not put the children at MTB at risk or threaten their safety or welfare.

89.     The sworn statements and medical certifications could have been immediately rectified on July 25, 2019, prior to the shut down, and the lack thereof did not create an imminent threat to the health or safety of MTB's students.

90.     In the August communication, Gibson stated that staff not included in Gibson's correspondence could not work with the children at MTB without County approval. This is not a requirement in Chapter 52.

91.     On August 12, 2019, Kelly instructed MTB to circulate a communication from the County stating MTB could "resume operations with the 12-identified staff who [met] qualifications to provide childcare" and that the Center would be responsible for "ensuring compliance with Chapter 52 of the Arlington child care code."

92.     The August 12th communication indicated that MTB did not have qualified staff as of the date of the inspection, when in fact it did, and that MTB was not compliance with the County Code.

93.     The County mandated the distribution of the August 12th communication to parents before the investigation was complete.

94.     On August 12, 2019, Friedman notified MTB that it was allowed to reopen on August 13, 2019 but was subject to stringent restrictions by the County.

95.     Under the new restrictions, MTB was prohibited from enrolling any new students beyond those students that were registered on July 25, 2019, even though many of its students left the Center due to the closure and the County's statements regarding MTB.

96.     The County also imposed a limitation on MTB staff that were allowed to work in the facility and mandated that *all new staff be approved by the County*.

97.     The County lacks the authority to exercise discretion over MTB's hiring and human resources management.

98.     After the closure, many parents of students at MTB wrote to the County in support of MTB and requested more information on why the Center was closed.

14

99.     Before the investigation into MTB concluded, Friedman, on behalf of CCS, mandated that MTB distribute the August 14, 2019 "Investigation Update" immediately to all of the parents of its students (the "Update") because the County had received so many inquiries from parents regarding the closure.

100.    This Investigation Update stated that MTB was closed on July 25, 2019 and found to be in violation of County Code.

101.    The Investigation Update also stated that "Inspectors discovered irregularities with respect to staff records/qualifications, staff-to-child ratios, group sizes, rodents, and food service."

102.    The Investigation Update also stated that because of the alleged violations, MTB would only be allowed to reopen at a reduced capacity, and that no new enrollees would be permitted.

103.    The Update also stated that all staff would have to be approved by the Defendant. The report concluded by stating that the full investigation report would follow the week of August 19th.

104.    In addition to the information provided in the Investigation Update, Gibson was providing information and updates to parents who contacted the County regarding MTB's status.

105.    Upon information and belief, in the course of providing these updates, Gibson represented to at least one family of an MTB student that MTB was "randomly finding staff" and that the Center was providing the County with the names of individuals that MTB "reported" to be on call or former employees of the Center.

106.    On August 7, 2019, in an email communication to one family of an MTB student, Gibson represented that as of August 7, 2020, MTB had "only 1 staff member me[]t the requirements and [was] eligible to work . . . ."

107.    As of August 9, 2019, there were at least seven (7) qualified staff members employed by MTB, which was acknowledged by Gibson in writing to MTB.

108.    These 7 individuals were employed by MTB on July 25, 2019 and remained employed by MTB through August 9, 2019.

109.    As of August 9, 2019, Gibson acknowledged that an additional five (5) staff members were eligible for work but for missing documentation that could be easily obtained.

110.    As of August 9, 2019, Gibson acknowledged three (3) additional staff members were eligible for work, however, their diplomas were not translated by a "recognized agency."

111.    As of July 25, 2019, there was no requirement that staff high school diplomas be translated by a "recognized agency."

112.    Mr. Saba and Ms. Desaba requested information on appealing the decision to restrict the number of students enrolled and new admissions, but their inquiries went unanswered.

113.    To date, the Investigation Update remains in the Center's records with the County and is publicly available.

**August 28, 2019 Inspection Report**

114.    The August 28, 2019 Inspection Report (the "Report") was the first time MTB learned about the specific violations alleged by CCS. The violation listed by CCS to justify MTB's suspension was Section 52-24(A)(3)(a), which requires all staff to be of "good character and reputation."

115.    In the Report, CCS alleged that MTB's staff did not have a "satisfactory sworn statement" and additionally listed inaccurate Social Security Numbers.

116.    As of the date of the July 25, 2019 investigation, there was no County requirement that MTB have Social Security numbers for its staff in its files.

16

117.    The Report also claimed that staff could not answer basic identifying information and had inconsistent information on their sworn statement, background check, and central registry report.

118.    The Report also listed several other minor violations regarding medical documentation, which were rectified on August 9th.

119.    Notably, the County inspected the Center in May of 2019 in connection with its childcare license renewal, reviewing the *same exact employee files*, and found all files were in compliance at that time.

120.    Though not required to, MTB submitted a written response to the County on September 26, 2019, providing the County with even more information and again requested a hearing to appeal the restrictions on admissions as provided for the in the County Code

121.    The County did not respond to MTB's request for a hearing and/or appeal.

122.    On several occasions following the release of the Report, MTB requested additional information from Gibson regarding the violations.

123.    While Gibson promised to respond fully to MTB's inquiries, MTB was never provided a response.

124.    The County promised to review and potentially lift the restrictions on MTB's license within three (3) months.

125.    MTB inquired about the review on multiple occasions, but the County did not respond and did not review the restrictions.

126.    On November 15, 2019, MTB submitted a Virginia Freedom of Information Act ("VFOIA") request for the investigation file, including a transcript or recording of the July 30, 2020 hearing.

127.    On November 19, 2019, MTB received a letter from Kelly stating that all restrictions on its license were lifted effectively immediately.

128.    The November 19th letter stated that MTB would have to remain in "substantial compliance" with Chapter 52.

129.    At all relevant times, including July 25, 2019, MTB was in substantial compliance with Chapter 52 of the County Code.

130.    The County responded to the FOIA request on November 21, 2019. The response did not include any recording or transcript of the July 30th hearing and MTB was told that no such recording or transcript exists.

131.    On April 1, 2020, MTB sent a letter to Friedman, in her capacity as Director of the Department of Human Services, outlining MTB's claims relating to the flawed investigations, forced closure, and subsequent restrictions on the Center's childcare license, putting the County on notice of its specific claims.

132.    The County Attorney responded on April 14, 2020, denying any wrongdoing by the County and/or its employees.

133.    Due to the County's improper shutdown of the Center and its subsequent restrictions on the Center's operations, to date, MTB has not been able to increase its enrollment to the pre-closure level.

**COUNT I: 42 U.S.C. SECTION 1983**
**14th AMENDMENT DUE PROCESS VIOLATIONS**

134.    Plaintiffs incorporate by reference the facts set forth in paragraphs 1-132 of the Complaint as if set forth in full.

135.    The Constitution of the United States, Amendment 14, § 1 provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

136.     Plaintiffs' interest in MTB's childcare license is a property interest protected by the due process clause found in The Constitution of the United States, Amendment 14, § 1.

137.     Acting under color of state law, Defendants suspended MTB's childcare license and subsequently placed restrictions on the Center's childcare license without sufficient pre-deprivation notice prior to suspension and restriction, as required by the due process clause in The Constitution of the United States, Amendment 14, § 1.

138.     The lack of sufficient pre-deprivation notice is demonstrated by the absence in the record of Defendants' articulated details for the basis of the license suspension and subsequent restrictions until issuing the August 28, 2019 Investigation Update.

139.     Defendants denied Plaintiffs their right to a hearing by temporarily suspending Plaintiffs' license without finding that public life, health, safety or welfare of a child is in imminent danger.

140.     Defendants denied Plaintiffs the opportunity to be represented by counsel, the right to confront its accusers by questioning Defendants' witnesses, and the right to adequately defend itself by presenting evidence or witnesses at the July 30, 2019 appeal hearing regarding the July 25, 2019 license suspension, as required by the due process clause in The Constitution of the United States, Amendment 14, § 1.

141.     Defendants' appeal decision issued on August 6, 2019, upholding the July 25, 2019 license suspension, fails to provide a substantial and credible explanation for the decision in violation of the due process clause The Constitution of the United States, Amendment 14, § 1.

142.     Defendants denied Plaintiffs the opportunity to be represented by counsel, the right to confront its accusers, and the right to adequately defend itself regarding the August 12 license

19

restrictions, as required by The Constitution of the United States, Amendment 14, § 1, by refusing Plaintiffs an opportunity to appeal the restrictions.

143.     Defendants' aforementioned violations of the due process clause in The Constitution of the United States, Amendment 14, § 1 deprived Plaintiffs of a property interest in its childcare license without due process of law.

144.     In addition, the actions of Defendants as set forth above were willful and malicious and taken with the intent to harm Plaintiffs.

145.     As a direct and proximate cause of Defendants' aforementioned violations, Plaintiffs suffered substantial economic damage and non-monetary damages including, but not limited to, loss of business, emotional damages, and injury to reputation.

## COUNT II: ARTICLE I, § 11 OF THE CONSTITUTION OF VIRGINIA DUE PROCESS VIOLATION

146.     Plaintiffs incorporate by reference the facts set forth in paragraphs 1-132 of the Complaint as if set forth in full.

147.     Article I, § 11 of the Constitution of Virginia provides "[t]hat no person shall be deprived of his life, liberty, or property without due process of law."

148.     Plaintiffs' interest in MTB's childcare license is a property interest protected by the due process clause found in Article I, § 11 of the Constitution of Virginia.

149.     Acting under color of state law, Defendants suspended MTB's childcare license and subsequently placed restrictions on the Center's childcare license without sufficient pre-deprivation notice prior to suspension and restriction, as required by the due process clause in Article I, § 11 of the Constitution of Virginia.

150.     Defendants denied Plaintiffs the opportunity to be heard before an impartial tribunal, as required by the due process clause in Article I, § 11 of the Constitution of Virginia, by

20

temporarily suspending Plaintiffs' license without finding that public life, health, safety or welfare of a child is in imminent danger.

151.    Defendants denied Plaintiffs the opportunity to be heard before an impartial tribunal, as required by the due process clause in Article I, § 11 of the Constitution of Virginia, by denying Plaintiffs the opportunity to present evidence or witnesses at the July 30, 2019 appeal hearing regarding the July 25, 2019 license suspension.

152.    Defendants denied Plaintiffs the opportunity to be heard before an impartial tribunal, as required by Article I, § 11 of the Constitution of Virginia, by refusing Plaintiffs an opportunity to appeal the August 12, 2019 license restrictions.

153.    Defendants' aforementioned violations of the due process clause in Article I, § 11 of the Constitution of Virginia deprived Plaintiff of a property interest in its childcare license without due process of law.

154.    In addition, the actions of Defendants as set forth above were willful and malicious and taken with the intent to harm Plaintiffs.

155.    As a direct and proximate cause of Defendants' aforementioned violations, Plaintiffs suffered substantial economic damage and non-monetary damages including, but not limited to, loss of business, emotional damages, and injury to reputation.

## COUNT III: 42 U.S.C. SECTION 1983
## 14th AMENDMENT EQUAL PROTECTION VIOLATION

156.    Plaintiffs incorporate by reference the facts set forth in paragraphs 1-133 of the Complaint as if set forth in full.

157.    The Constitution of the United States, Amendment 14, § 1 provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

158.    Acting under the color of state law, pursuant to Arlington County policies and with discriminatory motive, Gibson, Dally and Williams intentionally and deliberately subjected MTB to more intrusive, severe, and unlawful investigative and enforcement measures than applied to similarly situated licensees by: (1) interrogating MTB staff on July 25, 2019, including asking about I-9 documentation, which was irrelevant to the investigation; performing "language tests" that were not administered to any other childcare facility in Arlington County; (3) suspending the Center's childcare license based on "inconsistent information on critical documents that verify staff safety and their eligibility to care for children," when, in fact, MTB had all of the requisite documentation for its staff on July 25, 2019; and (4) restricting the Center's childcare license, relying on the same unfounded reasoning used to justify the suspension.

159.    Arlington County has authority and control over the Department of Human Services' investigators, including Gibson, Dally and Williams, and its policies. Arlington County was aware of Gibson's discriminatory and unduly intrusive investigation and enforcement measures against MTB and not other similarly situated childcare facilities, and it took no action to remedy the disparate situation.

160.    The Department of Human Services' Director, Anita Friedman, has authority and control over the Department's investigators, including Gibson, Dally and Williams.

161.    Friedman was aware that Gibson, Dally and Williams intentionally and deliberately subjected Plaintiff to more intrusive, severe, and unlawful investigative and enforcement measures---as Friedman has admitted that the investigators had no authority to enforce immigration laws and should not have been asking about I-9 documentation---and she took no action to remedy this disparate situation.

162.    Friedman, in fact, supported and upheld Gibson's decision to suspend Plaintiff's license despite lack of evidence to do so.

163.    Defendants' intentional and deliberate actions were taken under the color of state law to deprive Plaintiff of its right to equal protection of law under The Constitution of the United States, Amendment 14, § 1.

164.    In addition, the actions of Defendants as set forth above were willful and malicious and taken with the intent to harm Plaintiffs.

165.    As a direct and proximate cause of Defendants' aforementioned violations, Plaintiffs suffered substantial economic damage and non-monetary damages including, but not limited to, emotional damages and injury to reputation.

### COUNT IV: ARTICLE I, § 11 OF THE CONSTITUTION OF VIRGINIA EQUAL PROTECTION VIOLATION

166.    Plaintiffs incorporate by reference the facts set forth in paragraphs 1-132 of the Complaint as if set forth in full.

167.    Article I, § 11 of the Constitution of Virginia provides ". . . that the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin shall not be abridged."

168.    Acting under the color of state law, pursuant to Arlington County policies and upon a discriminatory basis, Gibson, Williams and Dally  intentionally and deliberately subjected MTB to more intrusive, severe, and unlawful investigative and enforcement measures than applied to similarly situated licensees by: (1) interrogating MTB staff on July 25, 2019, including asking about I-9 documentation, which was irrelevant to the investigation; (2) performing "language tests" that were not administered to any other childcare facility in Arlington County; (3) suspending MTB's childcare license based on "inconsistent information on critical documents that

23

verify staff safety and their eligibility to care for children," when, in fact, MTB had all of the requisite documentation for its staff on July 25, 2019; and (4) restricting the Center's childcare license, relying on the same unfounded reasoning used to justify the suspension.

169.    The Department of Human Services' Director, Anita Friedman, has authority and control over the Department's investigators, including Gibson, Dally and Williams.

170.    Friedman was aware that Gibson, Dally and Williams intentionally and deliberately subjected the Center to more intrusive, severe, and unlawful investigative and enforcement measures – as Friedman has admitted that the investigators had no authority to enforce immigration laws and should not have been asking about I-9 documentation – and she took no action to remedy this disparate situation.

171.    Friedman, in fact, supported and upheld Gibson's decision to suspend the Center's license despite lack of evidence to do so.

172.    Defendants' actions taken under the color of state law and based on discrimination deprived Plaintiffs of their right to equal protection of law under Article I, § 11 of the Constitution of Virginia.

173.    In addition, the actions of Defendants as set forth above were willful and malicious and taken with the intent to harm Plaintiffs.

174.    As a direct and proximate cause of Defendants' aforementioned violations, Plaintiffs suffered substantial economic damage and non-monetary damages including, but not limited to, business loss, emotional damages, and injury to reputation.

**COUNT V: VIOLATIONS OF 42 U.S.C. 1983**
**(Against the County, Friedman, Kelly, Gibson, Williams and Dally)**

175.    Plaintiffs incorporate by reference the facts set forth in paragraphs 1-132 of the Complaint as if set forth in full.

176.    Friedman, Kelly, Gibson, Williams and Dally engaged in discriminatory practices in their investigation of the Center and their enforcement of the Code.

177.    Specifically, Friedman, Kelly, Gibson, Williams and Dally targeted Plaintiffs because the Center was a Spanish immersion school and its employees were largely Hispanic native Spanish speakers.

178.    During the course of the County's investigation, Gibson, Williams and Dally intentionally and deliberately subjected Plaintiffs to more intrusive, severe, and unlawful investigative and enforcement measures than applied to similarly situated licensees by: (1) interrogating MTB staff on July 25, 2019, including asking about I-9 documentation, which was irrelevant to the investigation; (2) performing "language tests" that were not administered to any other childcare facility in Arlington County; (3) suspending Plaintiff's childcare license based on "inconsistent information on critical documents that verify staff safety and their eligibility to care for children," when, in fact, MTB had all of the requisite documentation for its staff on July 25, 2019; and (4) restricting the Center's childcare license, relying on the same unfounded reasoning used to justify the suspension.

179.    At all times, the County had authority and control over the policies and procedures implemented by Friedman, Kelly, Gibson, Williams and Daly. The County was aware of DHS's targeting and harassment of the Ms. Desaba, the Center, and its staff. The County did nothing to correct this unlawful and unlawful practice.

180.    Friedman, Kelly, Gibson, Williams and Dally intentionally and deliberately interfered with Plaintiffs' contractual relationships with the parents of MTB's students by shutting down the Center and the subsequent restrictions placed on the Center.

181.    The above actions, policies and procedures by the County, Friedman, Kelly, Gibson, Williams and Dally were designed to punish Plaintiffs because of Plaintiffs operated a Spanish immersion school.

182.    In addition, the actions of Defendants as set forth above were willful and malicious and taken with the intent to harm Plaintiffs.

183.    As a direct and proximate cause of Defendants' aforementioned violations, Plaintiffs suffered substantial economic damage and non-monetary damages including, but not limited to, emotional damages and injury to reputation.

**COUNT VI: DEFAMATION**
**(Against the County, Friedman, and Gibson)**

184.    Plaintiffs incorporate by reference the facts set forth in paragraphs 1-132 of the Complaint as if set forth in full.

185.    Friedman drafted an Investigation Update on the Department of Human Services Director's letterhead to make the following false statement about the Center: "Inspectors discovered irregularities with respect to staff records/qualifications, staff-to-child ratios, group sizes, rodents, and food service."

186.    On August 14, 2019,  as demanded by Friedman, Plaintiffs published the Investigation Update on the County's behalf by forwarding it to all parents of children enrolled in MTB, with Director Friedman copied in the email distribution, based on Defendant's mandate that Plaintiffs do so.

187.    At no point during this investigation were MTB's staff-to-child ratio and group sizes found to be in violation of County Code.

188.    The investigation into the Center did not result in any findings of the presence of rodents.

189.     The investigation into the Center did not result in any findings regarding improper food service.

190.     The County and Friedman knew the aforementioned statement from its Investigation Update was false, as neither its inspections of MTB nor its corresponding investigative record revealed or articulated evidence of irregularities with respect to staff-to-child ratios, group sizes, rodents, or food service.

191.     To date, the false statement remains in the Center's records with the County and is publicly available.

192.     In addition to the information provided in the Investigation Update, Gibson was providing information and updates to parents contacting the County regarding MTB's status.

193.     Upon information and belief, in the course of providing these updates, Gibson represented to at least one family of an MTB student that MTB was "randomly finding staff" and that the Center was providing the County with the names of individuals that MTB "reported" to be on call or former employees of the Center.

194.     On August 7, 2019, in an email communication to one family of an MTB student, Gibson represented that as of August 7, 2020, MTB had "only 1 staff member me[]t the requirements and [was] eligible to work . . . ."

195.     As of August 7, 2019, there were at least seven (7) qualified staff members employed by MTB, and eight (8) additional staff members that were qualified but missing insignificant documentation in their files.

196.     Gibson knew these statements regarding MTB's staff were false at the time she made the statements.

197.     In addition, the actions of Defendants as set forth above were willful and malicious and taken with the intent to harm Plaintiffs.

198.     As a direct and proximate cause of Defendants' aforementioned violations, Plaintiffs suffered substantial economic damage and non-monetary damages including, but not limited to, business loss, emotional damages, and injury to reputation.

**COUNT VII: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

199.     Plaintiffs incorporate by reference the facts set forth in paragraphs 1-132 of the Complaint as if set forth in full.

200.     A business relationship existed between Plaintiffs and third parties, consisting of the parents of the 62 students enrolled at MTB as of July 25, 2019 and the parents of six students scheduled to enroll in Fall 2019.

201.     Defendants were aware that this business relationship between the Center and its students' parents existed, as evidenced by the Center's operation with a childcare license approved by Defendants for over 10 years.

202.     Defendants interfered with MTB's business relationships through improper methods by suspending and subsequently restricting the Center's childcare license without affording Plaintiffs due process or equal protection of law and by mandating that MTB send a letter to the students' parents containing false information about the reasons underlying the suspension and subsequent license restrictions.

203.     Defendants intended to interfere with MTBs business relationships, as Defendants knew suspending and restricting MTB's childcare license would disrupt its ability to operate and provide services to its clients and that the letter containing false information would harm the Center's and Ms. DeSaba's reputation with the community.

204.    It is reasonably certain that the business relationships between MTB and the students' parents would have continued had Defendants not disrupted MTB's operations for 12 business days, subsequently restricted the Center's ability to operate at full capacity, and forced Plaintiffs to publish false statements about the basis for the license suspension and subsequent restriction.

205.    In addition, the actions of Defendants as set forth above were willful and malicious and taken with the intent to harm Plaintiffs.

206.    As a direct and proximate cause of Defendants' aforementioned violations, Plaintiffs suffered substantial economic damage and non-monetary damages including, but not limited to, emotional damages, injury to reputation, and disruption of the Center's business and Plaintiffs' relationships with MTB's students' parents.

## JUYY DEMAND

Plaintiffs demand a trial by jury on all issues triable herein.

## RELIEF REQUESTED

Plaintiffs request that the Court enter judgment in their favor and award the following relief:

(a)  Award of compensatory damages in the amount of $4,000,000.00;

(b)  An award of punitive damages in the amount of $350,000.00;

(c)  An award of attorneys' fees incurred in this action pursuant to; and

Any other relief this Court deems just and proper.


Dated: October 2, 2020


/s/ Roya Vasseghi
Roya Vasseghi VSB No.  85122

VASSEGHI LAW, PLLC
9663-A Main Street
Fairfax, VA 22031
(703) 755-0905 Tel.
(703) 563-7401 Fax
roya@vasseghilaw.com

Kellie Budd VSB. No. 72084
Daniel Hernandez VSB No. 95384
Mahdavi Doumar Budd & Levine, PLLC
1503 Wilson Blvd., Suite 170
Arlington, VA 22209
(703) 243-3737 Phone
(703) 524-7610 Fax
kbudd@mdblaw.com
dhernandez@mdblaw.com

*Counsel for Plaintiffs*